I'm going to call the next three cases at the same time to be heard at the same time, so we can avoid any... They're all somewhat related, and I want to avoid any unnecessary repetition. Yes, Your Honor. So we're going to hear next Sass v. Thomas, Secora v. Thomas, and Pierce v. Thomas. Mr. Sady. May it please the Court, Steve Sady for the petitioners. In 2008, through the Second Chance Act, Congress made a critical change in the approach to punishment, recognizing that greater participation in community corrections was essential for a greater likelihood of prisoners' successful reintegration into the community. In 3624C, Congress doubled the time for community corrections to the extent practicable from six months to 12 months. Congress also directed the Bureau of Prisons to issue community corrections regulations that assured three things. First, that the five factors in 3621D would be considered. Second, that each decision be made on an individualized basis. And third, that the duration of community corrections be of sufficient likelihood of duration to provide the greatest likelihood of successful reintegration. The Bureau of Prisons did not follow those directions. As a result, we're in front of the Court with a class action case and two other cases that are joined as related cases. The Bureau of Prisons retained its categorical rule, not an individual rule, but a categorical rule that generally capped community corrections at six months. As a practical matter, in this district, in this Sheridan facility, which is the definition for the class, not a single person has received greater than six months during the period of time that the discovery was provided. And in the western region, we have the lowest duration of stays in community corrections in the entire country. The DOP's rules regarding the duration of community corrections are not contained in regulations. They're in memorandum and program statements. Let me just – so after the Second Chance Act was passed, Congress – when Congress adopted it, Congress directed the Bureau of Prisons to adopt regulations within 90 days. They didn't meet that deadline, but – A hundred days later, they did. A hundred days later, they did. In the meantime, they adopted this – one of these memorandums that we're going to be focusing on was the April 14, 2008, memorandum. And then later, after the regs, they adopted the October 21, 2008, memorandum. Now, as I understand it, in one of these cases, I'm not sure if it's Secura or one of the others, the district court invalidated the regulations that that –     And then later, on October 24, 2008, the Board of Trustees of Orange Marsh declared that the promulgation of those regulations was not only a hundred days too late, but failed to provide the notice and comment that's required. So they're not on the table, and the DOP is not applying those regs? That is correct. They've conceded that point that they are not adopting them. So the only, so the only, so what the DOP is doing is applying, I gather, the standards that were in Program Statement 73-10.04 as modified by the, by the 2000, April 14, 2008 memorandum. That is correct. And that says that community corrections is only possible. But it doesn't say only possible. It does. In 73, at page 301 of the executive record, the 73-10.04 states that the community corrections is only possible for greater than six months under extraordinary justification. And that's a key phrase, because extraordinary actually has a meaning. But you have to read the 73, the Program Statement, along with the April 14, 2008 memorandum. Yes. You have to. And the, because the April 14th memorandum, as does the November 14th memorandum, they both incorporate 73-10.04. Yes, but they both modify the Program Statement. They make it clear in the 2008 that each individual is supposed to get, you know, an individual attention. Only within the context of this only possible language in 73-10.04, and there's a number of ways we know that. In every decision from Judge Marsh in Sass at pages 7 and 464 on the class, in the Sass opinion at page 8 of the Sass executive record, and in the Pierce at pages 16 to 17, Judge Marsh makes the finding, and this has never been disputed, that the extraordinary circumstances, only possible under extraordinary circumstances, standard from 73-10.04 is incorporated to, by the April 14th memorandum. In fact, in the Pierce briefing at 141, the, of the executive record, the government says that, that this extraordinary justification is part of the April 14th standard. That's the statute. So how does that violate the statute? Because as a practical matter, it means that we have a categorical instead of individual consideration, and we have, most importantly, we don't have untrammeled consideration of the full 12 months that Congress clearly intended in the structure of the statute. What in the language of the statute tells you that's what Congress intended? Because they, without qualification, they said not more than 12 months so that we know that there is no statutory basis for a qualification of creating a presumption of less time in community corrections. Second, the guideline for the regulations that were supposed to be promulgated said individual, not categorical, consideration. And third, they said, we want the greatest likelihood, the sufficient duration for the greatest likelihood of successful integration. And as the ---- I'm looking at the statute. I'm struggling to find the words you're trying to draw from the statute. I just don't see it. Let me try to be more specific. In 3624C, they say up to 12 months of community corrections. It says not to exceed 12 months. Yes. It says a portion of the final months of that term not to exceed 12 months. Yes. And what we have here is something that doesn't exceed 12 months. It doesn't exceed 6 months is our problem. Well, but ---- And that's fine, but if something doesn't go over 6 months, then it doesn't go over 12 months, does it? I would say that there's a clear congressional intent expressed here that up to 12 months  That's where I'm having trouble. If Congress wants to say something, it usually figures out a way to say it. In this case, it doesn't say give them 12 months. It says a portion of the final months of the term not to exceed 12 months. And in the same section, it has a reporting requirement. So Congress is going to find out every year exactly what VOP does with this. And I take it if you're right, Congress will discover quickly that the intent that it had wasn't realized and so needs to change the statute. I don't know how I see the current statute as giving you the result you're hoping for here. The statute has no limitation on 6 months. That's what has been read into the statute by the Bureau of Prisons. I don't think the statute's read a limitation. It's decided to exercise its discretion, except in the extraordinary case, not to go over 6 months, because in its judgment, that's sufficient. And as a practical matter, extraordinary means that that is the standard under 3582C for the Bureau of Prisons to file a motion to reduce the sentence. So the only time that we have people who are going to be getting more than 6 months is if they meet the standard for basically for being for dying in prison, which is very, very rarely granted, which is why we have zero people getting over 6 months. I believe that's the case. Let me ask the same question, maybe a little bit differently. Before the second transaction, what did the statute provide instead of not 6 months, right? 6 months or 10 percent of the sentence. All right. So Congress changed it to this, not to exceed 12 months, right? That is correct. Now, is there anything in the legislative history that tells you why they made that change or what the intent of that change was? We have not cited to any part of the legislative history that addresses that particular change. What we would argue is that because there is a change, that when Congress amends a statute, that amendment is intended to have meaning in the real world. And here Well, that's what we're trying to find out. I mean, what is the meaning it's supposed to have? And I believe that the meaning What's the reason for that change? It doesn't mean, obviously, that it should always be 12 months, right?  Well, we're not arguing that. And we're saying that given individual consideration and given the 3621B factors, that they can provide less. It's possible now, as Judge Clifton, I think, intimates, it's possible under these memos and these program statements that a prisoner could get, you know, more than six and less than 12 months in an RRC, right? There's a theoretical possibility, but I do not think that it is truly a possibility because it's only possible under extraordinary circumstances. Those circumstances are not No, no, no. That's just the way maybe it's interpreted in the Western region. But in other regions, it's apparently looked at a little bit differently. Right. The discretion is exercised a little bit differently. Out of Duluth, for some reason, they seem to give more. Well, which means these memos and the program statement have the capacity for that interpretation, which means there's room for the exercise of discretion. It's not categorical like it was in Rodriguez. I believe it is categorical because there is this six-month limit that has that there is there's a couple of different problems with it. First of all, it's a substantive rule that was enacted without notice and comment, so there's no opportunity. So it's an improper rule, both as a functional analysis and because Congress said that the sufficient duration was to be set by regulation. But even more critically, under 706, that six-month rule, we know, not only had no articulation of reasoning for why that rule should exist, but it's contrary to the empirical evidence. One thing we can definitely tell from reading the Second Chance Act is Congress intended empirical an empirical basis for making a rule. Here we have the director of the Bureau of Prison saying that six months is counterproductive. And then in discovery, we have the smoking gun e-mail saying that there's no empirical support for more than six months being anything bad. So we have the rule violates 706 by not having been reasons articulated, and it also never considered the possibility of greater community corrections through earlier commencement of the halfway house and full exploitation of the home detention. And this gets us to the heart of what successful reintegration to the community means. Obviously, and I think this is clear from the congressional acts surrounding the Second Chance Act, greater time working in the community, somebody who has three months working in the community or eight months working in the community is going to be successfully reintegrated easier. Somebody who has started being able to meet with his family eight months earlier, maybe even saving a marriage or being able to provide guidance for a child in that intervening time, that greater time that would be available if they would take advantage of this time, that's the type of thing that makes successful reintegration into the community possible. Starting your treatment, the types of treatment that can be a vast array, but we know that both mental health, substance abuse treatment in the community, in the community where they're ultimately going to be living, with the hammer of any types of problems resulting in being returned to prison, that is going to be encouraging the exact language of the statute. Both the Strong and the Kroger District Courts looked at this same statutory system and saw clearly that Congress intended at the very least full and fair consideration of the 12 months, not cutting off, saying it's only possible with the six-month limitation. And with the Court's permission, I have reserved the remaining time. The Court has a question. Well, let me just – yeah, I just want to make sure. You didn't address – why don't you just clarify for us the distinctions between the other two cases, Sass and Thomas, just so we – Certainly. We address them completely. And Pierce. I'm sorry, Pierce. The first one is Pierce. There is a mootness question raised that I believe is simply answered by this Court's precedent. The Serrato case was one that purely involved a length of time in community corrections because the six months had already been provided because she succeeded in the state boot camp. So we have absolute Ninth Circuit precedent, not only the reasoning that would cover this type of situation where there's custody under 2241 that's changed because of the – obviously, the difference between home detention and being behind walls is something that is – something that would be an equitable consideration in deciding whether to provide under 325A. Well, it seems inconsistent to me to say that greater community release would better integrate a degree of supervision and better facilitate reentry to say that, so let's do away with supervised release, seems inconsistent with the notion that continuing reentry efforts are a good thing. Not at all. I think it's completely reconcilable with that, and that is because the district court makes the final decision. And what we've seen historically in these types of cases is that courts can look at that and see how the person is doing. If the person is not still under supervision, you deny it, but it's a factor that can be considered. And that's all we're saying, that it can create the possibility of a reward of lesser time on supervised release, the same way with drug courts, that that's in our district. If somebody does well in the drug court, they can get a reduction of a period of time on supervised release as a reward. It's not inconsistent with the idea that supervised release can be a very helpful and necessary thing that should continue to the full duration. It's just a factor that can be considered to reduce. Mr. Sass has the – is in the Rodriguez class, the people who are more than 12 months out. I think he clearly suffered a rule – he had a ruling that he could not – He had a ruling before there was a rule. The question in his case is the rightness issue. Right. And what we're saying is that that first decision was governed by Rodriguez and should have been granted based on Rodriguez. The second one was the exact same thing as Rodriguez, because they were saying, we're not going to consider you until you're at the end of your term, so that it was, in effect, categorically excluding based on the time remaining. So in that way, that it was identical. No, no, no. Wait a minute. But he's challenging the new – I'll call them regulations. Right? He's – That's what he's doing. He's challenging, you know, these two new memos and the program statement. Isn't that what he's doing? He's saying that under the – that under the rules that were being applied to him on his request for more than one year of community corrections, that those were denied improperly initially based on Rodriguez, improperly thereafter based on – on 73-1004. Right. Which required the extraordinary circumstances. But those – but that was never applied to him. It was – 73-1004 was applied to him because in his second request, because they  So he didn't get up to the – the 19 through 21 months rather than the 11 to 13. When was his second request? What's that? I said when was his second – you say when was his second request? I will get that for you. Is it in the record? I believe so. Had he made a second request? I believe so. In fact, doesn't he come up – didn't he come up for a program review after the court proceedings? Yes. And the reason that we think that it's right, and the arguments that we've made in the briefing, is that these are right because these are policies that are applied regardless of a request for a transfer or anything else because there is an annual request. In our reply brief, at the end of the reply brief, we set out the two program statements that provide for an annual review, which should include the determination of whether community corrections would be appropriate, as well as the ability to consider it at other times. So therefore, what we're – what he was bringing up was I am subject to these rules. They've been applied to me and they will apply to me in the future. And because he was suffering a concrete effect, not only for current but for future, he is – his case should have been treated as right and understood how to rule in other merits. Just to be clear about this, the impression that I had sounds like it might be similar to the impression Judge Tshima had, which is that his – he came before the – made his request even – the first one even prior to the adoption of the Second Chance Act. And so the Court's ultimate ruling, as I understood it, was that, look, his claim isn't right. In fact, he's saying that he's complaining about the BOP's failure to respond to the statute and complaining about the program statement, the regulation. But, in fact, he was denied before any of those were actually in effect. Now, presumably, he's come back and knocked on the door since. But I don't know that we've gotten an amended petition that brings those subsequent activities before the Court. I believe that the record reflects that there was a second time where they applied the 7310 standard to him. I've missed the second time. As revised by the subsequent memos? That would have been through the – I assume through the April 14th and the 7310, and then there was the November. But the critical point of rightness, I believe, is that he was subject to these policies regardless of whether they had been applied to him yet or not. It's – if you can't do – if you have to wait until you – until the end of your sentence to bring up your question, you've already lost the opportunity for the benefit. What's his status today? Do you know, Mr. Shanley? I believe he still has a 2012 projected release date. That's what he said. And I do not believe he's in community corrections. Well, it's 2012. He really couldn't be. Yes, he could. He could be. Well, yeah, he could. He could. But I think you're right that he can't be because of the six-month limitation, which is in violation of – Even the 12-month limitation. Okay. It was 2012. We're more than 12 months away from 2012. Exactly. That's what I'm saying, is that he's – Sass is the – is the 3621B class, so the people with greater than 12 months. He raised the medical issues, saying, hey, these are medical issues. I got brought up here by a – on a voluntary furlough. You don't really need to have me in – behind bars at this point. Why don't you put me in community corrections now? So that if you consider all those five factors, that would be the right thing. And he's not getting that consideration, certainly not getting that consideration without the six-month practically irrebuttable presumption. Thank you. Okay. I'll give you some extra time for rebuttal. Thank you. Thank you, Judge. Thank you. Don't worry. May it please the Court. Kelly Zusman appearing on behalf of the United States. Your Honor, I think that as the district court observed, this is a case that turns on the plain language of the statute. And by that I mean both the Second Chance Act and the APA. Now, the Second Chance Act provided that the time for halfway house placement was now increased. The cap is increased from six months to 12 months. There's no presumption of 12 months. The statute, in fact, says no presumption of any particular period of time. One of the key aspects, though, about all of the statutes that give the Bureau its authority to manage the federal inmate population is discretion. I think a recognition that it is the Bureau that's in the best position to make the individualized assessments that have been commanded by Congress. And that's precisely what's happened here. Now, the April and the November 2008 memos are entirely consistent with what Congress said. They do three primary things. They made three primary changes in response to this statutory directive. That is that they started the process sooner. They started at looking at pre-release placement 17 to 19 months before the inmate's projected release date instead of 13 to 15. The memos emphasize that there must be an individualized assessment of that community transitional placement. And that's also reflected in those memos. And finally, it said to the extent that our program statement is in conflict with anything in these memos, these memos control. So I think by doing those three key things, the Bureau of Prisons directly responded to what Congress wanted it to. The other statute that's at play here is the APA. And that is that the APA says that this Court does not have plenary review over what the BOP does. It is simply to look at whether or not there was a violation of formal rulemaking, and I think the district court here properly said there was not, that these are interpretive rules, they're not substantive. The memos. The memos, right. And just to back up, the regulations here that the court said needed to go through notice and comment formal rulemaking are undergoing that process now. So we have not challenged that on appeal. The Bureau has drafted new regs. They're with the DOJ, and that process is underway. So the only question is then, can the Bureau continue operating and managing its inmate population with these two memos? And I think Judge Marsh properly looked at, first off, they are interpretive, and so therefore they're not subject to formal rulemaking. And second off, substantively, they're entirely consistent with the statute. Now, Judge Tashima, you asked a question about legislative history. And although we don't have a lot on that, we do have a bit of legislative history that was put into the record by the Petitioners. And the goal here is to reduce recidivism and to look for ways of doing that. Now, in terms of this desire for an empirical background, I think, Judge Clifton, you pointed out appropriately that that's where Congress has stepped in and said, we want to be the ones to look at that. So on an annual basis, you, Bureau of Prisons, must report to us both on the numbers of people that you're putting into halfway houses and the duration of that placement. So to the extent that the Bureau is not, in fact, satisfying Congress's directive, Congress has reserved to itself that particular review function. This Court's review is only to, under the APA, is to determine if what they're doing is consistent with the plain language of 3624. And it is. Let me ask you about the six-month period. And there are issues that surround this, but I want to focus on the substantive question, is that just where it is BOP comes up with the six-month, in effect, time limit, unless it's an extraordinary circumstance. What's the factual or substantive basis for coming up with that time limit? And what's reflected in the April memo is that it's consistent with Bureau experience that that's the approximate amount of time that an inmate needs to accomplish those transitional goals, finding a house, finding a job.   And it's consistent with the time that an inmate needs to accomplish those transitional goals. So what is that statement based on? You know, you have the e-mail Mr. Sady points to that says that we have no empirical evidence. That's correct. What they have is their experience. And I guess the analogy that I would draw the Court to that is that we don't have any case studies. We don't have any statistics that look at any link between the amount of time someone spends in a halfway house. We have somebody who's been there a long time as well. This is the way it works, and it works pretty well. And we accept testimony like that all the time. As an example, in a drug case, police officers frequently testify about, you know, four ounces is not a user quantity, it's a distribution quantity. And they don't do that based upon any empirical studies. They do that based upon their experience in working drug cases. Now, the Bureau of Prisons has right now in its inmate population over 200,000 people. They have 114,000 people on supervised release. And they have approximately 11,000 people in halfway houses now. That's a tremendous body of experience to draw from. And I think also what's important to keep in mind is that halfway houses are not designed for punishment, and they're not designed as a reward. They're designed to serve very specific purposes, and that is to get an inmate out into the community successfully. They need time, many of them, to find a job, to find a house. Now, there are instances. I had a case a few years ago where it was someone who had a home. He had an MBA degree. He had a job waiting for him. And so the Bureau said two weeks in a halfway house for him because he doesn't need any of those transitional services. And I offer that simply as an illustration of what halfway houses are designed to do. It's not simply an alternative to time in prison. I mean, courts are going into the business now. There are reentry courts. The District of Hawaii has started a reentry court. The state's been going at it for a while now. And this probably has less to do with the resolution of this lawsuit than the question as to how the Bureau and the DOJ generally approach this. But I am surprised at the six-month time period and how little there seemed to be behind that proposition, given the attention that's being given by our branch as well to the notion of reentry. And it's a little disappointing to discover the e-mail that says there's nothing really that supports that. That's a gut sense from an organization that should have reason to have a good gut sense. But still, now that everybody's focused on the problems of reentry because of the obvious problems of recidivism, I think Mr. Sadie makes a fair point as to say, well, why do we have such a firm bar toward a longer period of time when, in fact, we don't know that a longer period of time wouldn't be more useful? And I think Congress has directly expressed that desire through 3624b-5. I mean, I think that's why they want these annual reports from the Bureau, so that they can look at that issue. Well, that will tell them what the Bureau has done. I don't know what's going to tell them what else will give them any experience at all whether encouraging or permitting more release periods of 8 months, 10 months, all the way up to 12 months might not have a beneficial effect. But we're also building a body of examples of those 6- to 12-month placements. As we put in the record, there have been over 250 placements between the 6- and 12-month period since the passage of the Second Chance Act. And although we readily concede that there has been no one from Sheridan, please keep in mind these are national policies. Sheridan has 1,200 inmates in its FCI and another 400 in the camp. That's less than 1% of the federal prison population. So we are, over the course of time, developing a body of examples. We have at least 250 people now who have been released between 6 and 12 months from the expiration of their term of imprisonment. And I think as time goes, we will see more and more of that. The question, though, for this Court is not whether — and one thing I also want to point out about the Sheridan example is that you can draw a couple of conclusions from that. I think the petitioners would have you draw the conclusion that because none from Sheridan, that necessarily means that the Bureau isn't actually applying this eligibility up to 12 months. The other inference you can draw, though, from that is that there simply hasn't been anyone from Sheridan. There hasn't been a case come up in which a 6- to 12-month placement was deemed appropriate or even available in this particular community. And where you've got two different inferences that can be drawn from the same fact, one of the principles of APA law is a presumption of agency regularity. And I think that the other way to look at this, though, is that — and I don't know if you agree with this, you haven't said, but Mr. Sady says that the April 2008 memo creates a presumption that 6 months is it. But that's inconsistent with and undermines the whole notion of individual assessment. And I think that's incorrect. There is nothing in the Bureau's memos that say presume 6 months. They say that's been our experience. They say — but they emphasize this must be individualized. And you've been given several examples of the type of individualized assessment that the Bureau has been conducting. They're in the record at ER 425 to 430. And I think what you'll see from examining those is they are very individualized. They look at, okay, have you taken all of the classes that you're supposed to have taken? Do you have a job lined up? They look at the resources within the community. Each one of those responses by the Bureau to the inmate who wants that 12-month placement is specifically tailored to that particular inmate. And Mr. Sady would say that, as I understand his argument, and I may not, but if you read the April 2008 memo with the program statement, that in order to get more — a placement more than 6 months, you have to show unusual or extraordinary circumstances. And it also would seem, I guess Mr. Sady would say, is that that's contrary to the individual assessment that Congress is requiring. And I guess I would disagree. I think the individualized assessment is a different question from the burden of proof. And essentially that's what the Bureau is saying, is we're going to look at up to 6 months, and we're going to look at 6 months as being what in our experience is generally sufficient to provide those transitional needs. You are eligible for up to 12, but we're going to have to look for something unusual or extraordinary before we go up to 12. It seems to me that so far, what amounts to unusual or extraordinary is the person, you know, has a fatal disease or something like that. And that's about it. Right. That's about the only thing the Bureau, at least the Western region, seems to accept. And that, you see, gets to the type of case where we have, which says, for instance, that, you know, when a policy directive turns into establishing what's in effect a binding norm, it crosses a line that, you know, should be treated as a regulation. And that's, I think, Mr. Sadie's argument. That's what happens, what's happened here, isn't it, with those memos, that they're in effect become a binding norm in the Western region. And I understand that that's Mr. Sadie's interpretation. But what do the facts show? I mean, the facts seem to support that. I mean, nobody gets more than 6 months unless, you know, you have terminal cancer. Right. And that was one example from the Western region. But that's all there is. That's the only example. There aren't any other examples. Are there? There are 250 other examples from other parts of the country. No, but in the Western, we're talking about the Western region here. What's happening here? Well, actually, the class is limited to Sheridan. That's right. That's what we're talking about. We're talking about what's happening here. And nobody gets more than 6 months unless, you know, you have a fatal disease. Well, in fact, I don't think you have any of the Bureau. You don't have any specifics about any inmate from Sheridan. And so I, again, return to the you can draw the conclusion that zero means necessarily that they aren't complying with the SCA. Or you can draw the conclusion that zero means that they simply haven't found anyone who needs 8 months or 10 months and a half. You see, but the directive says in order to get more than six months, you have to show extraordinary unusual circumstances. And the record further shows that extraordinary and unusual circumstances is defined to mean, you know, something like a like a terminal illness. You know what the record shows? I don't believe that. Well, what does the record show is as, you know, amounting to an extraordinary circumstance besides the terminal illness? For the western region, that's it. That's it. That's all there is. Well, we have nothing in the record that goes into any specifics of any other case. So I think what Judge Marshall. He's taking as much discovery as he can. That's all the record shows. Actually, he got 6,000 pages of discovery that included every single RRC request and the BOP's response. What you have in the record before you is simply those portions that the Petitioners decided they wanted to see. All right. And you didn't put anything else in. That was your burden, isn't it? It's our burden to prove that the Bureau of Prisons didn't violate the APA through these memoranda that they are relying upon to carry out the Second Chance Act. That's our burden. And, again, I would return the Court to Section 706 and what it says, which is basically your role. And I'm sorry. I'm out of time. May I finish my answer? Go ahead. We combined three cases. Okay. Thank you. I'm sorry. Is that this Court's, actually it was the District Court's role, and then this Court on review is to look at whether or not there is arbitrary or capricious action. Judge Marsh said, I'm looking at these memos and I'm looking at the plain language of the statute and I see that they are consistent and interpretive. And so, therefore, there is no APA violation. Now, if Congress looks at the reports from the Bureau and sees that there's been no one from Sheridan who has been released, Congress may respond and Congress may modify this and they may make the language more express. But with what we have right now, what the Bureau has been doing is entirely consistent. And if I may, just one additional note from the legislative history. This is at ER 256. And it's not a lot. We know that the overarching goal of the SCA is to reduce recidivism. But at 256, there is language that says that the Bureau of Prisons should use halfway houses, and I quote, unless there are further questions. How about the other cases, Mr. Sass's case? Sure. Mr. Sass, we have claimed, is not ripe. And primarily what happened was in February of 2008, he applied for placement in a halfway house. He was nowhere near the end of his term and he was told, you're not eligible and wait for your next program review. Now, I think Mr. Sadie's is partially correct in that he says that there is an additional response from the BOP dated May 2008. So after the April memo, acknowledging that he is now eligible for up to 12 months, but again putting him off to his next program review. Well, hasn't he had another program review? Isn't that like annual or something like that? It's semi-annual. And that's Program Statement 5322.12. It says it's supposed to take place every 180 days. And as far as I know, there's nothing in the record that then follows that down the road. So if he had another program review, it's not in the record. That's correct. As far as I know, Your Honor, that's correct. Mr. Sadie may be able to correct me on that. But if you look at the district court's opinion in Sass at page 19, he looks at February 2008, when Mr. Sass made his request, and Karen Angus' response in May of 2008. And I think that's where the timeline on that particular case ends. Now, Mr. Sass, of course, is raising the same claims that Mr. Beeman and Sanob within the Sakura case, which is he wants that midterm transfer consideration. Now, in terms of Rodriguez and its application to Mr. Sass, our position, and I think we've said this in the brief probably three times, is that Rodriguez simply holds that the Bureau has to exercise discretion, that they can't make these decisions on a categorical basis, and that's precisely what's happening. One note on Mr. Pierce. Our position is, is that his claim is moot. He is released. He's been released for some time. And that unlike the Mujahid case, this is not an instance in which he has been over-incarcerated. Those cases that recognize that someone who's on supervised release still has a live controversy against the Bureau are ones in which they're claiming a denial of a reduction in their term of imprisonment. The RDAP cases, that's what we're talking about here. There's no claim of over-incarceration. It's simply a matter of where the Bureau puts Mr. Pierce within its institutional system. Unless there are further questions, I'll submit. That's because RFC qualifies as a place of imprisonment. That's correct. Okay. All right. Thank you. Those are, by the way, my initials, so I guess I qualify as a place of imprisonment. As would home detention. And that's why we were saying that there would be an equitable interest in if you were denied consideration, when you should have been considered for that, it falls flat within Serrato and the reasoning of the other cases because it's greater incarceration. That's on SAS at the brief at page 27 and the excerpt record at 44 is where the discussion is, where the BOP staff member is saying, yes, you got turned down because of this earlier time period. Now we're not going to consider you to the later time period, exactly what happened in Rodriguez, where they said we're not going to consider you until the end of your sentence. He's in the same situation. He is – he suffers a ripe problem from the time he – from the time he initially filed all the way through. Well, I guess the question in my mind isn't whether he subsequently encounters a problem, but the case that came before the Court and the case that's on appeal to us, it seems to me, involves claims that don't arise until the statute is subsequently adopted. But after this – this Karen Angus declaration is after the statute is enacted, and the – And they get a response saying it will come up at his next program review, which is – That's as far as I know where the record stops. And in the Sass opinion at 2833 and 36, the Court notes that the April and the November memoranda basically create the same type of limitation, and that limitation is a substantive one to a binding norm of no more than six months. And because of that binding norm, and the class has been certified about regarding their current situation with the – what may happen in the future, that's a totally different question. But there's nothing in the record, you know, what happened at his subsequent program review, right? That is correct. I would submit that – and our argument is based on it was applying the April 14th, November 14th memoranda, which all go back to 731004, which says no more than six months absent extraordinary circumstances. So, Mr. Sotomayor, I just want to ask you, is it the notion or is it the idea that the VOP has added this additional requirement of unusual and extraordinary circumstances that troubles you? It's a binding norm, and because it's under the – Oh. You used the term binding. Yes. But it really is, you know, being – I don't know, generous or whatever. Call it a presumption. It seems to be a rebuttable presumption, at least. It's – So what's wrong with that? Why couldn't the VOP interpret the statute to say we're going to apply a rebuttable presumption here that six months will do it based upon some general experience that we've had? And so everybody starts out, you know, they're not going to get any more than six months, you know? Three layers to that. One is that the statute doesn't create any basis for that. So it's picked out without any – the statute says 12 months and doesn't provide for any presumptions in the lower amount. And by saying individual consideration, I think they're saying that you have to consider, without prejudice, the full 12 months. But you also have – we have a directive from Congress that you are to be saying what the sufficient duration to accomplish, not avoid recidivism necessarily, which is certainly a component, but successful reintegration into the community, which is critically different, I think, because, for example, the FOIA gets two weeks because he's got too many resources, he still may have family needs, things that would – employment help for reintegration that the full six months of home detention might be relevant for. So you have – that type of calculation is not occurring if you have this six-month presumption, this type of limitation on the ability to do that. I said presumption, but actually, if you read it, it says pre-release RRC needs can usually be accommodated. Well, and that – but that's where the reference to 43 of 1004 goes, because they say only possible upon a showing of an undefined extraordinary circumstances which we know from the 3582C context applies to death's door, the death rattle rule. Unless there are other questions. Thank you, Mr. Cheney. Thank you, Your Honor. The matter – these three cases will be submitted at this time. Thank you all very much for your arguments. We appreciate your cooperation.
judges: Tashima, Paez, Clifton